UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No.: 8:17-cr-41-T-36TGW

DANIEL R. KENDRICKS
_____/

# **O R D E R**

This matter comes before the Court upon Defendant Daniel Kendricks' Motion to Suppress Fruits of Illegal Search of Home and Request for Evidentiary Hearing (Doc. 16), Kendricks' Memorandum of Law in Support of Motion to Suppress Fruits of Illegal Search of Home (Doc. 49), and Kendricks' Motion to Supplement the Record or in the Alternative Grant the Motion to Suppress due to a Giglio Violation (Doc. 55). The Government responded in opposition to both motions and the memorandum of law. Docs. 24, 54, 57. An evidentiary hearing was held on June 6, 2017, and continued on July 26, 2017. During the hearing on June 6, 2017, Detective Jeffrey Bliss, Deputy Sean Cappiello, and Deputy Timothy Eason testified on behalf of the Government, and Emma Kendricks testified on behalf of Kendricks. Doc. 47. During the July 26, 2017 hearing, Kendricks conducted a supplemental cross-examination of Cappiello.[1] The Court, having considered the motions and being fully advised in the premises, will deny Kendricks' motion to suppress and motion to supplement.

---

[1] Kendricks conceded during the supplemental hearing that because he was permitted to cross-examine Cappiello regarding the information disclosed subsequent to the first hearing, any potential violation under *Giglio v. United States*, 405 U.S. 150 (1972) was cured, and there was no basis to pursue this argument. Additionally, although the motion to suppress posits that Kendricks made statements that were the fruit of an unconstitutional search, he later advised the Court that the case law does not support suppression on the basis of any *Miranda v. Arizona*, 384 U.S. 436 (1966) violation.

## I.   BACKGROUND AND FACTS[2]

In October 2016, the Manatee County Sheriff's Office was investigating an individual referred to as D.G. for homicide based on reports that he was seen walking with the homicide victim just prior to the victim being shot and killed.  Tr. 7:1-23.  Two days after the homicide, Detective Jeffrey Bliss spoke with D.G. at Palmetto High School, and D.G. indicated that he lived at 1904 2nd Avenue West, Palmetto, Florida (the "residence"), which was owned by D.G.'s grandmother, Emma Kendricks.  Tr. 8:2-11, 12:18-19, 23:18-20.  Based on the facts learned during his investigation, Bliss authored and obtained an arrest warrant for D.G. for the crime of second degree murder, which listed his address as the residence.  Tr. 10:1-6, 11:22, 12:6-7; Gov't Ex. 1.  Bliss also authored and obtained a ten-day search warrant for the residence, which expired on October 16, 2016.  Tr. 10:1-6, 23:21-23.

The residence is a three bedroom, two bathroom home with a one car garage.  Tr. 19:15-17.  At the front of the home is a gated chain-link fence.  Gov't Ex. 2-3.  The gate opens to a driveway leading to the garage.  Gov't Ex. 3.  Connected to the left of the driveway is a sidewalk that leads to a patio area and the residence's front door.  *Id.*  To the right of the garage is additional driveway and parking space.  *Id.*  The front door opens to a living area, which has a doorway to the garage.  Tr. 36:7-9, 13-16.  Upon entering the garage from the residence, there is one couch facing the garage door, and another couch positioned against the wall, perpendicular to the first, so that the couches form a backwards L when facing the garage door.  Def. Ex. 1.  There is some space between where the couches would otherwise meet, and additional space between the second

---

[2] The Court has determined the facts based on the testimony of witnesses and exhibits offered into evidence at the hearings held on June 6, 2017 and July 26, 2017. Where conflicting evidence was presented, the Court weighed the credibility of the witnesses.

couch and the garage door. *Id.* These spaces cannot be clearly viewed from the doorway into the residence. Def. Ex. 2. In the middle of the garage, there is a glass table. Def. Ex. 1-3.

Bliss, together with a team of detectives, went to the residence the day the warrants were obtained, October 6, 2016, at which time Emma Kendricks, Kendricks, and Louis Davis, a family friend, were present. Tr. 12:13-21, 18:13-16. D.G. was not present, and had not been to the residence for a day or two, but Emma Kendricks confirmed that D.G. resided there. Tr. 18:3-8. Bliss read the search warrant to the occupants and the detectives searched the residence. Tr. 13:7-10. Kendricks and Emma Kendricks directed Bliss to a box of D.G.'s personal items on the floor of the main living room, and Bliss was told that D.G. slept on the couch of the living room. Tr. 13:11-18.

Bliss continued to search for D.G. after the search warrant was executed. Tr. 13:20-16:14. He received various tips, including that D.G. remained in the area and was receiving assistance from family. Tr. 16:1-10. Based on these reports, on the evening of October 16, 2016, Bliss asked Detective Sean Cappiello, who worked in the warrants unit, to search for D.G. at the residence. Tr. 16:3-20, 25:15-17.

Cappiello arrived at the residence around 5:30 or 5:45 on the morning of October 17, 2016, accompanied by Deputy Timothy Eason, Cappiello's partner in the warrants unit, and Canine Deputy Jared Wolfe. Tr:28:6-10, 30:7-16. When the officers arrived at the residence, the gate to the driveway was open. Tr. 31:9-11. Cappiello walked to the front door, while Eason waited at the garage door, and Wolfe went around the right side to the back of the residence. Tr. 33:5-9, 34:12-20, 35:2-9. Cappiello knocked on the door and, eventually, Davis answered. Tr. 35:14-20. Cappiello explained that he had an arrest warrant for D.G. and that the officers were there to look

for him.  Tr. 35:24-36:2.  Davis responded that he did not believe D.G. was inside the residence, but advised that the officers could enter the residence.  Tr. 36:4-6.

Cappiello and Eason entered the residence, and Davis knocked on the door leading into the garage.  Kendricks, who had been laying on one of the couches in the garage, opened the door.  Tr. 36:7-21.  Cappiello explained again that he was there to execute the warrant for D.G., and, although Kendricks did not believe D.G. was there, he told the officers they could look for D.G.  Tr. 37:3-6.  The officers searched the entire residence, except the garage, and Cappiello asked Kendricks where D.G. would be if he was there.  Tr. 37:8-17.  Kendricks responded that D.G. would be in the garage.  Tr. 37:17-18.

Cappiello entered the garage, followed by Kendricks, then Eason.  Tr. 38:10-14.  After Cappiello walked around the couch facing the garage door, he saw a firearm on the glass table.  Tr. 38:16-39:1.  Cappiello advised Eason of the gun's presence, and Eason immediately turned and observed the firearm on the table.  Tr. 70:23-71:6.  Although other items were on the glass table, none obscured Cappiello's or Eason's view of the firearm, and Cappiello did not move any objects in order to see the firearm.  Tr. 39:3-12, 71:4-89.  Cappiello seized the firearm and disarmed it to make it safe.  Tr. 40:21-25.

At the time of the seizure, Kendricks was unsecured and standing between the officers.  He sought to sit on the couch, or go outside to smoke a cigarette, but Cappiello directed that Kendricks should remain in the garage because of Wolfe's presence with the canine outside.  Cappiello called teletype to determine whether the firearm was stolen, and Kendricks asked Cappiello what he was doing.  Cappiello responded that he was calling in the gun, and Kendricks inquired whether he was going to prison.  Cappiello responded that Kendricks would not, as long as he was not a convicted felon, and Kendricks responded that he had been to prison.  After this statement was made, teletype

confirmed that Kendricks was a convicted felon. Subsequently, the officers learned that the firearm was stolen.

## II.    DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people . . . against unreasonable searches and seizures" in the absence of a warrant based on probable cause "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3, 132 S. Ct. 945, 950-51 n.3, 181 L. Ed. 2d 911 (2012)) (internal citation omitted). To deter lawless police conduct, evidence seized in violation of the Fourth Amendment must be excluded. *See Terry v. Ohio*, 392 U.S. 1, 12 (1968). A warrantless search is *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks and citation omitted).

### A.    Supplementing the Record with the Assistant United States Attorney's Notes

"Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). "In order to introduce a prior inconsistent statement, 'the court must be persuaded that the statements are indeed inconsistent.' " *United States v. Simpkins*, 240 F. App'x 334, 342 (11th Cir. 2007) (quoting *United States v. Hale*, 442 U.S. 171, 176, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975)); *see also United States v. Jones*, 913 F.2d 1552, 1564-65 (11th Cir. 1990) (holding that the district court

did not abuse its discretion in prohibiting impeachment of a witness with prior deposition testimony because the deposition testimony was not inconsistent with the trial testimony and "[e]xclusion of prior consistent testimony is proper under Fed. R. Evid. 613."). Additionally, "a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993); *see also United States v. Carter*, 776 F.3d 1309, 1328-29 (11th Cir. 2015).

Indeed, courts have previously declined to allow witnesses to be impeached by an attorney's interview notes. In *United States v. Almonte*, 956 F.2d 27, 28 (2d Cir. 1992), an attorney took notes of interviews with Drug Enforcement Agency ("DEA") agents, and the defense sought to discredit the agents during trial by introducing the Assistant United States Attorney's ("AUSA") notes. The Government objected to use of the notes because they were not a verbatim transcript, but instead a shorthand summary of the statements. *Id.* at 29. The appellate court affirmed the district court's conclusion that the notes could not be attributed to the witnesses. *Id.* at 30.

Here, following the first hearing, the AUSA disclosed to Kendricks notes of the AUSA's interview with Cappiello because of potential discrepancies with the testimony during the first hearing. During the first hearing, Cappiello testified that "well, we had a conversation, myself and Mr. Kendricks, because he asked if he was going to get arrested and I told him if he was a convicted felon, he told me, yes, I went to prison so there right then is when I made the decision to call to confirm that." Tr. 56:1-6. Cappiello further testified that Kendricks "told [Cappiello] at first—he asked if he was going to go to jail, and [Cappiello] said, well, if you're a convicted felon, yeah, you were lying right next to [the firearm].. . . . [A]nd then [Kendricks] said, well, I've been to

prison. That's when [Cappiello] called Teletype." Tr. 57:10-16. The AUSA's notes contain the following bullet points:

- Goes in [to the garage] and makes it [the firearm] safe
- Kendricks sat down where he was laying down and went to smoke a cig[arette]
  - Trying to go outside to . . . smoke
  - Don't do it b/c Wolfe is out there w/the dog
- Called in to make sure he's a felon from the garage 10-15 mins
- What are you doing? What's going on
- Making sure you're not a felon
- He says . . . just got out of prison
- While he was on phone, got word back. Just got the felon status back. Told [Cappiello] he had 18 [felonies]
- Immediately arrest him

                                    ***
- Take him out and put him in the car and lady [Emma Kendricks] shows up

                                    ***
- Runs the gun, comes back stolen. Wolfe or Eason, are [illegible] says to Kendricks that the gun is stolen

Doc. 55 p. 22-24. At the July 26th hearing conducted following the notes' disclosure, Cappiello testified that he was calling teletype to determine whether the firearm was stolen and, at the same time, Kendricks asked whether he was going to jail. Thus, at the second hearing, Cappiello testified that Kendricks revealed his prior incarceration after the call to teletype had been initiated. Kendricks did not attempt to impeach Cappiello during the second hearing with the AUSA's notes.

The Court finds that Cappiello's testimony at both hearings is consistent with the information contained in the AUSA's notes. The testimony and notes both suggest that Kendricks' statement that he previously had been to prison occurred either contemporaneously with, or immediately following the initiation of the telephone call to teletype. Indeed, the notes are vague as to the chronology, and it appears that although the telephone call may have lasted 10-15 minutes, Kendricks' question occurred early in this time period. This is also consistent with the report Cappiello authored following the arrest, which states that the call to teletype confirmed Kendricks'

status as a convicted felon. Any minute difference as to the timing does not present any inconsistency, and does not alter the analysis of whether the initial and continued seizure of the firearm was permissible under the Fourth Amendment. Accordingly, the notes are not proper impeachment material on this issue.

Kendricks also seeks to undermine Cappiello's testimony based on several other purported inconsistencies. First, during the June 6th hearing, Cappiello testified that he "assumed" Wolfe was outside while Cappiello and Eason were in the garage. In the AUSA's notes, it states that after Cappiello made the firearm safe, Kendricks sat on a couch to smoke a cigarette, and was trying to go outside to smoke, but Cappiello stated not to because Wolfe was outside with the canine. Doc. 55 p. 22. There is no inconsistency between these statements. Cappiello last saw Wolfe outside, and assumed he remained there. Indeed, during the first hearing, Cappiello later affirmatively testified that Wolfe was outside. Tr. 56:7-8. Cappiello's prior testimony that this was an assumption is not inconsistent with the AUSA's notes that Wolfe was outside.

Kendricks further argues that Cappiello's testimony that he "d[id]n't think" he would have told Wolfe to stop Kendricks if he left is inconsistent with the notes' statement that Cappiello told Kendricks not to go outside because Wolfe was outside with the canine. Tr. 57:2-5; Doc. 55 p. 30. These statements, too, are not inconsistent. During the testimony, Cappiello testified as to whether he would provide an instruction to Wolfe, whereas the notes record what Cappiello instructed Kendricks to do—or not do—for his safety. Indeed, during the second hearing, Cappiello clarified that his instruction to Kendricks not to go outside was based on the fact that he did not want Kendricks to be bitten by the canine.

Kendricks also claims that the notes are inconsistent with Cappiello's testimony that "[t]he first thing [he] saw was the gun" after walking into the garage and, after making the firearm safe,

he "held it for a minute or two" or "for a few minutes," and then "might have put it down on the table" when he made the call to teletype. Tr. 51:25; 53:14-18. It is not clear what in the notes Kendricks alleges to be inconsistent, but he characterizes the notes as stating that while Kendricks was sitting and smoking the cigarette, Cappiello calls in to determine whether Kendricks is a felon, and the call takes ten to fifteen minutes. Doc. 55 p. 6. Nothing in Cappiello's testimony pertains to Kendricks' location or activities when the call is initiated, or the duration of the telephone call. Accordingly, there is no inconsistency.

Kendricks additionally takes issue with Cappiello's testimony that after making the firearm safe, he followed the normal practice of running the serial number of the firearm by calling teletype, who "confirmed that it was stolen," and running Cappiello's criminal history. Tr. 40:21-41:4. Cappiello later testified that he stayed in the garage while he called teletype. Tr. 54:10. In the notes, it states that the officers do not learn that the firearm is stolen until they are outside standing at the police vehicle. Doc. 55 p. 24. Again, there is no inconsistency between the notes and the testimony. The notes provide only the time when teletype learned and advised the officers that the firearm was stolen, whereas the testimony reflects that at some point after Cappiello called teletype from the garage, teletype confirmed the firearm was stolen. Indeed, Cappiello stated during his testimony that the common procedure is to take a firearm to the police vehicle to make sure that it is not stolen. Tr. 76:9-11. Moreover, upon being questioned more specifically during the second hearing, Cappiello testified that while in the garage, the decision to run the firearm's serial number and Kendricks' criminal history occurred at the same time, because as he was calling in the serial number, Kendricks revealed that he had previously been incarcerated. While Kendricks, Cappiello, and Eason remained in the garage, teletype confirmed Kendricks' status as a convicted felon, and the telephone call was ended. After Kendricks was arrested and the group

relocated outside, teletype called the officers back to confirm that the firearm was stolen. Accordingly, Cappiello's testimony is entirely consistent with the notes.

Further, Kendricks asserts that Cappiello's testimony that (1) Davis told the officers they could enter the residence and look for D.G., Tr. 44:3-9; and (2) Kendricks advised that D.G. would be in the garage if D.G. were present, Tr. 37:16-18, are inconsistent with the notes. However, the notes state on the first page, without identifying the speaker, that the following exchange occurred: "Hey we're here to see if [D.G.] is here," with the response, "I don't know if he's here, come in & look." Doc. 55 p. 21. Thus, as to the first point, Kendricks is incorrect. Also, although the notes also state "Louis Davis says he sleep[s] in the garage," on the following page there is also a notation of "Garage → b/c [D.G] sleeps there." *Id.* p. 21-22. The notes further indicate that Kendricks led the officers through the house, and was, therefore, present throughout the search, making it entirely reasonable that both Davis and Kendricks provided information as to where Kendricks slept. Moreover, Kendricks did not question Cappiello regarding any purported discrepancy during the second hearing. Accordingly, there is no inconsistency between the notes and Cappiello's testimony on these points.

Kendricks also contends there is an inconsistency between the testimony and the notes regarding whether Cappiello spoke with Emma Kendricks when he entered the house. In the testimony, Cappiello testified that Davis and Emma Kendricks were in the living room, and that he did not speak to Emma Kendricks. Tr. 45:6-12. In the notes, it states that Cappiello spoke with Emma Kendricks outside, after Kendricks' arrest. Doc. 55 p. 24. These statements are not inconsistent. Instead, Cappiello's testimony clearly pertained to whether he spoke with Emma Kendricks upon entering the house, and was not related to whether Cappiello had ever, at any

point, spoken to Emma Kendricks. Additionally, Kendricks did not inquire as to any purported discrepancy between Cappiello's testimony and the notes during the second hearing.

Finally, Kendricks asserts that an inconsistency exists regarding where Kendricks was located at the time of the firearm's seizure, as well as the time immediately following the seizure. During the first hearing, when asked where Eason was the "whole time," Cappiello responded that Eason was "[r]ight next to Mr. Kendricks, I guess you could call it, the left corner of the—when you walk in to the left and the corner." Tr. 59:7-10. In the notes, it states that Kendricks sat on the couch after the firearm was seized. Doc. 55 p. 22. Cappiello's testimony is not inconsistent with the notes. During the hearing, Cappiello had not clearly testified as to where Kendricks was during the search of the garage and seizure of the firearm, except to state that when Cappiello first saw the firearm, Kendricks was behind Cappiello. Tr. 52:22-24. Cappiello was not asked, and did not offer, any explanation as to whether Kendricks moved around in the garage after that point. The question directed to where Eason was the "whole time" does not shed light on whether Kendricks was standing in the same place for the duration of the events in the garage. Moreover, during the second evidentiary hearing, Cappiello explained that Kendricks did at one point sit on the couch, but stood up because Cappiello requested he move further away from the firearm, and because Kendricks began smoking the cigarette. After being told that he should not go outside because of the presence of the canine, Kendricks stood near Eason. Accordingly, there is no inconsistency. Instead, the notes simply lack detail regarding Kendricks' movements during the events.

The issues presented in this case are whether the approach and search of the residence, and whether the initial and continued seizure of the firearm conformed to the Fourth Amendment. Cappiello's testimony on these points is entirely consistent with what is contained in the AUSA's

notes. Kendricks attempts to impeach Cappiello by alleging ambiguities in the testimony and notes on entirely collateral matters. However, when asked more specifically regarding these matters, Cappiello's testimony proved to be consistent. Because no inconsistencies exist, there is no basis to supplement the record with the AUSA's notes. Moreover, because the notes are no more than the AUSA's shorthand summary, they may not be used as impeachment evidence against Cappiello. *Carter*, 776 F.3d 1309, 1328-29.

### B. Recusal of the United States Attorney's Office for the Middle District of Florida

A substantial burden is placed on defendants seeking recusal or disqualification of an entire United States Attorney's office "because of serious separation of powers implications and broad concerns about the efficient administration of justice." *United States v. Goff*, No. 2:07cr322-MHT, 2009 WL 223369, at *2 (N.D. Ala. Jan .29, 2009) (citing *United States v. Bolden*, 353 F.3d 870, 875-76 (10th Cir. 2003) (remarking that "we can only rarely—if ever—imagine a scenario in which a district court could properly disqualify an entire United States Attorney's office" and "disqualifying an entire United States Attorney's office is almost always reversible error")). To be allowed to call a prosecutor as a witness, a defendant ordinarily must show a compelling need, or that the testimony is vital to the defense and cannot be obtained from any other source. 110 A.L.R. Fed. 523, § 2 (1992) (citing *United States v. La Rouche Campaign*, 695 F. Supp. 1292 (D. Mass. 1988); *United States v. Troutman*, 814 F.2d 1428 (10th Cir. 1987); *United States v. Perlmutter*, 637 F. Supp. 1134 (S.D.N.Y. 1986)).

Kendricks requested that in the event the suppression hearing was reopened to allow him to continue his cross-examination of Cappiello, the United States Attorney's Office for the Middle District of Florida be recused pursuant to Rule 4-3.7 of the Rules Regulating the Florida Bar, which states:

**(a) When Lawyer May Testify**.  A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client unless:

> (1) the testimony relates to an uncontested issue;
> (2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
> (3) the testimony relates to the nature and value of legal services rendered in the case; or
> (4) disqualification of the lawyer would work substantial hardship on the client.

**(b) Other Members of Law Firm as Witnesses**.  A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by rule 4-1.7 or 4-1.9 [governing conflicts of interest with current or former clients].

This rule is in place because "[c]ombining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client."  Rule Regulating Fla. Bar 4-.37 cmt. Additionally, "[t]he trier of fact may be confused or misled by a lawyer serving as both advocate and witness."  *Id.*

Kendricks, without explanation, states that re-opening the suppression hearing renders the AUSA a witness and implicates Kendricks' right to confront and impeach witnesses.  Notably, Kendricks proceeded with the continuation of the suppression hearing without raising this point or seeking to call the AUSA as a witness.  The AUSA's notes, which are not inconsistent with Cappiello's testimony, are not proper impeachment evidence, and no need exists for the AUSA to be called as a witness to testify as to inconsistencies between the notes and Cappiello's testimony. Moreover, Kendricks may not use the notes for the truth of the matter asserted, because they are hearsay.  Fed. R. Evid. 801-802.  Therefore, Kendricks has not shown that he has a reason to call the AUSA as a witness, and certainly has not shown a compelling need or that such testimony is necessary to a defense theory.

### C. The Search of the Residence

Here, the United States justifies the search of the residence on two bases: (1) the arrest warrant for D.G., and (2) consent. The interaction began when the officers approached the residence through the open gate. Police officers—even when not armed with a warrant—"may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Jardines*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011)). Accordingly, Cappiello's and Eason's initial approach of the residence did not constitute an illegal search.

#### 1. Arrest Warrant

The officers were then permitted to enter the house on the basis of the arrest warrant. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *U.S. v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000) (quoting *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639 (1980)). "[F]or law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Id.* (quoting *United States v. Magluta*, 443 F.3d 1530, 1536 (11th Cir. 1995)).

Although Kendricks makes general assertions that D.G. "had not lived in nor been present in the residence for some time," Doc. 16 p. 2, Kendricks presents no argument that the officers did not have a reasonable belief that the residence was D.G.'s dwelling or that he was inside. Indeed, D.G. informed law enforcement that he lived at the residence, and when law enforcement executed

the search warrant, D.G.'s personal items were at the residence, and law enforcement was informed that D.G. slept on the couch in the residence's living room. Tr. 8:3-8, 13:11-18. Based on this, the officers had a reasonable belief that the residence was D.G.'s dwelling.

The officers also had a reasonable belief that D.G. would be present at the house. In the absence of evidence to the contrary, it is reasonable to believe that a person will be home at certain times of the day, such as at 6 a.m. *Bervaldi*, 226 F.3d at 1256. The officers here arrived around 5:30 or 5:45 in the morning. Additionally, after initially failing to locate D.G. at the residence, Bliss followed up on reports that D.G. may have fled to Indiana or Texas, but D.G. could not be found at these other locations. Tr. 13:20-15:5. More reports were received that D.G. had not fled, but was receiving assistance from family. Tr. 16:1-10. Based on this, the officers could reasonably believe that D.G. was in the residence, where family lived.

Once permissibly within the residence pursuant to an arrest warrant—as the officers were here—law enforcement may search for an arrestee anywhere in the house where he or she may be found. *Maryland v. Buie*, 494 U.S. 325, 330 110 S. Ct. 1093, 1096, 108 L. Ed. 2d 276 (1990) (stating that "[i]t is not disputed that until the point of [the defendant's] arrest the police had the right, based on the authority of the arrest warrant, to search anywhere in the house that [the defendant] might have been found . . . ."). Prior to entering the garage, the officers had done no more than glance into the space. Tr. 45:23-25: Given the presence of the couches, it would not be possible to discern whether D.G. was hiding in the garage, rendering Kendricks' argument that the officers "re-entered" the garage after ascertaining that D.G. was not present unfounded. Doc. 16 p.3, 10; Tr. 47:9-16; Def. Ex. 1-2. Accordingly, the officers' search of the garage was permissible pursuant to the arrest warrant.

### 2. Consent

The officers were additionally entitled to enter the residence on the basis of consent. An individual may give consent to a search, but the search is limited to the scope of the consent given. *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). A general consent to search is "constrained by the bounds of reasonableness . . . ." *Id.*; *see also United States v. Street*, 472 F.3d 1298, 1308 (11th Cir. 2006). Here, the officers obtained consent from Davis and Kendricks, and did not exceed the scope of that consent. After answering the door, Davis invited the officers into the residence, and stated they could look for D.G. Tr. 36:4-6, 4:3-6. Kendricks then invited the officers to look for D.G. and, ultimately, directed the officers to the garage. Tr. 37:3-18, 46:20-47:3. Indeed, Kendricks concedes that in the event consent was given, the scope of such consent "was to search for a person within the residence." Doc. 16 p.9. D.G. could have been in the garage, hidden on the floor in front of the couch facing the garage door, or on the opposite side of the couch closest to the garage door. Def. Ex. 1-2. Accordingly, the scope of the consent would extend to entering the garage to look in these places. In doing so, the table where the firearm was located would be within Cappiello's plain view. *Id.*

Kendricks relies on *Jardines* to argue that the simple fact that a canine was brought onto the property rendered the search unconstitutional. In *Jardines*, the police received an unverified tip that marijuana was being grown at the defendant's residence, and subsequently sent a joint surveillance team with the DEA to the defendant's home with a trained canine handler and his drug-sniffing dog. 133 S. Ct. 1413. The handler approached the home, giving the dog as much leeway as possible, and the dog alerted on the front porch of the home, detecting the strongest scent at the base of the front door. *Id.* The handler applied for and received a search warrant on the basis of the dog's alert. *Id.* The subsequent search of the defendant's home revealed marijuana,

resulting in the defendant being charged with trafficking in cannabis. *Id.* The defendant moved to suppress the marijuana plants, arguing "that the canine investigation was an unreasonable search." *Id.*

The Supreme Court held that the warrantless canine search in *Jardines* was unreasonable. *Id.* at 1417-18. In reaching this conclusion, the Court recognized that "the home is first among equals" "when it comes to the Fourth Amendment," and that the curtilage—which included the front porch—is part of the home for purposes of the Fourth Amendment. *Id.* at 1414-15. The Court explained that although " a police officer not armed with a warrant may approach a home and knock" in the absence of a warrant, police were not permitted to "introduce[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence . . . ." *Id.* at 1416. The fact that "the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence [wa]s enough to establish that a search occurred." *Id.* at 1417.

*Jardines* is plainly inapplicable to whether the seizure of the firearm in this case was permitted under the Fourth Amendment. Although a canine was present both here and in *Jardines*, the similarities end there. The canine in this case was not used to search the property, but was present for apprehension purposes due to the severity of the crime for which D.G. was suspected, and should D.G. have decided to flee. Tr. 30:19-23. Nothing suggests that the canine was present for purposes of gathering evidence, nor that any drug-sniff was conducted, and no evidence was obtained from the canine or Wolfe. Indeed, their presence was entirely inconsequential and extraneous to the events leading to and the discovery of the firearm.

### D.     The Seizure of the Firearm

Two exceptions to the warrant requirement are relevant to the seizure of the firearm.  One exception to the warrant requirement is where the " 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)).  The exigent circumstances exception permits officers to seize a weapon that poses a threat to themselves or the public in the absence of a warrant.  *United States v. Newsome*, 457 F.3d 1221 (11th Cir. 2007) (concluding that a gun seized during the arrest of a man who had shot his wife was admissible under the exigent circumstances exception).  Accordingly, Cappiello was permitted to seize the firearm and make it safe by disarming it for purposes of officer safety.

An additional relevant exception to the Fourth Amendment's warrant requirement is the "plain-view" doctrine.  *Horton v. California*, 496 U.S. 128, 133 (1990).  As its name suggests, under this doctrine, where law enforcement has prior justification for an intrusion, and "c[o]me[s] inadvertently across a piece of evidence incriminating the accused," and the evidence's incriminating nature is "immediately apparent," then there is no violation of the Fourth Amendment.  *Id.* at 135-36.  The Supreme Court has explained that for the plain view doctrine to apply, the item must be in plain view, its incriminating character must be immediately apparent, the officer must be lawfully located in the place from which he observes the evidence, and the officer must have a lawful right of access to the evidence.  *Id.* at 136-37.  Regarding the requirement that an item's criminal nature be immediately apparent, "[t]his prong 'merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that

certain items may be contraband.' " *United States v. Folk*, 954 F.3d 905, 911 (11th Cir. 2014)

(quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502 (1983)).

Kendricks contends that (1) the firearm was not in plain view because the table had other

items on it, (2) the officers were not lawfully in the garage because the search for D.G. had

concluded, and the officers' continued presence and seizure of the firearm to confer with teletype

violated the Fourth Amendment, and (3) the incriminating character of the firearm was not

immediately apparent because it is not necessarily illegal to possess a firearm, but instead further

investigation was required to discover the contraband nature of the firearm. Doc. 49 p. 2-3.

As an initial matter, the firearm was in Cappiello's and Eason's plain view. Both officers

testified that nothing on the table obscured their view of the firearm. Kendricks presented the

testimony of his mother, Emma Kendricks, to contradict this. Emma Kendricks testified that she

was in the garage the evening before the officers searched the residence, the table was messy, and

had paper, plates, beer bottles, mail, lunch, cups, and two bottles of whiskey on it, and she did not

clean the table until after Kendricks' arrest. Tr. 84:1-16. Additionally, while she was in the garage

the evening before, Emma Kendricks did not see the gun. Tr. 85:13-17. She was not, however, in

the garage when the officers located the firearm. Tr. 87:16-19. Accordingly, her testimony is not

persuasive in contradicting the officers' testimony that the firearm was plainly visible on the table.

With respect to the requirement that the incriminating nature of an item seized under the

plain view doctrine be immediately apparent, Kendricks concedes that there are some instances in

which firearms meet this requirement. For example, in *Fish v. Brown*, 838 F.3d 1153, 1159-60,

1166 (11th Cir. 2016), before going to the defendant's house, law enforcement was aware that the

defendant was the subject of a domestic violence injunction that prohibited possession of firearms.

After gaining lawful entry to the house, officers observed a large revolver hanging from its holder

from a bedpost. *Id.* The Eleventh Circuit held that seizure of the firearm was lawful under the plain view doctrine because the officer knew the injunction against defendant prohibited possession of firearms, rendering its illegal character immediately apparent.[3] *Id.* at 1167.

Similarly, in *Folk*, an officer knew that the defendant was a convicted felon based on the officer's prior work investigating a gang of which the defendant was a member. 754 F.3d at 908-09. The officer obtained a search warrant for the defendant's residence based on undercover drug deals the officer had engaged in with another inhabitant of the residence. *Id.* at 909. While executing the warrant, the officer observed two firearms in the defendant's closet and seized the weapons based on his prior knowledge that the defendant was a convicted felon. *Id.* The defendant moved to suppress the weapons, arguing that the warrant did not authorize seizure of weapons, and the government argued that the seizure was permissible under the plain view doctrine. *Id.* at 910. The Eleventh Circuit held that the plain view doctrine applied because the officer lawfully entered the closet during the search for narcotics and knew that the defendant was a convicted felon, rendering the incriminating nature of the firearms immediately apparent. *Id.* at 912.

Kendricks contends, however, that these cases are inapplicable because the officers did not know Kendricks was a convicted felon when they entered the residence. Doc. 49 p.7. He argues that his case is analogous to that of *United States v. Szymkowiak*, 727 F.2d 95 (6th Cir. 1984), in which the United States Court of Appeals for the Sixth Circuit held that a firearm was seized in violation of the Fourth Amendment because the plain view doctrine did not apply. In *Szymkowiak*, law enforcement obtained a warrant to search the defendant's apartment for jewelry and a television set and, while executing the warrant, discovered and seized two firearms, whose legality

---

[3] The Court in *Fish* was evaluating the constitutionality of the search and seizure to determine whether the officers were entitled to qualified immunity in the defendant's 42 U.S.C. § 1983 claim against them.

or illegality they could not immediately ascertain. *Id.* at 96. The officers requested that an agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF") join them at the defendant's apartment to assist in determining the legality of the weapons, which he did. *Id.* The ATF agent advised that federal law did not prohibit possession of the weapons, but that Ohio law "probably" did, and the officers seized the firearms on the agent's recommendation. *Id.*

In deciding whether the plain view doctrine applied, the Sixth Circuit reviewed its prior decision of *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973). In *Gray*, officers executed a search warrant for intoxicating liquors, and while the defendant remained downstairs with one officer, a second officer located firearms in the closet of the second floor. 484 F.2d at 353-54. The officer brought the firearms downstairs and recorded their serial numbers before finishing the search, then left the property with the defendant. *Id.* The officers later ran the serial numbers through a national crime database and learned the weapons were stolen. *Id.* at 354. The Sixth Circuit determined that the incriminating nature of the weapons was not immediately apparent because they were not contraband, they had no nexus to the items that were the subject of the warrant, and the officers had no knowledge that the firearms were evidence of other crimes. *Id.* 355. Subsequently, based on its prior holding in *Gray*, the Sixth Circuit in *Szymkowiak* determined that the plain view doctrine did not apply because the intrinsic nature of the weapons was not incriminating, even to the ATF expert, based on the facts available to law enforcement. 727 F.2d 99.

Kendricks also seeks to liken his case to *Arizona v. Hicks*, 480 U.S. 321, 323, 107 S. Ct. 1149, 1152, 94 L. Ed. 2d 347 (1987), in which an officer, while investigating a shooting, became suspicious of expensive stereo equipment in the defendant's apartment, and moved some of the equipment to read the serial numbers. The officer called the serial numbers in and was informed

that the equipment was stolen. *Id.* The Court held that the recording of the serial numbers did not constitute a seizure because it did not meaningfully interfere with the defendant's possessory interest. *Id.* at 324. Moving the equipment, however, to be able to read the serial numbers, did constitute a search because it required "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of the [defendant's] privacy unjustified by the exigent circumstances that validated the entry." *Id.* at 325. Thus, probable cause that the equipment was contraband was required for the plain view doctrine to apply. *Id.* at 327.

None of the cases relied on by Kendricks are applicable here. The initial seizure of the firearm was permissible for purposes of officer safety. The officers were still in the process of searching for D.G. pursuant to the arrest warrant and Kendricks' and Davis' consent upon seeing the firearm. At that point, Kendricks was unsecured and in the garage with the officers. Under these circumstances, Cappiello acted within the bounds of the Fourth Amendment by seizing the weapon and disarming it for purposes of safety. While doing so, Cappiello was also permitted to observe the serial number of the firearm, which was lawfully exposed to his view.

Additionally, Cappiello's testimony, which the Court finds to be credible, demonstrates that no information was obtained from teletype before the illegal nature of the firearm became apparent. Instead, the evidence demonstrates that Kendricks' statement regarding his prior incarceration was either just prior to, or contemporaneous with Cappiello calling teletype, and that Cappiello obtained probable cause regarding the incriminating nature of the firearm before receiving any information from teletype. The seizure was not impermissibly extended to obtain external information. Accordingly, this is not like *Szymkowiak*, in which the officers were unsure of the legality of the weapons even after calling an expert, or *Gray*, in which officers were not

acting for purposes of safety. Nor is *Hicks* applicable. Unlike the movement of the stereo equipment to expose the serial numbers, Cappiello's movement of the firearm for officer safety was permitted.

Instead, a case more analogous to the one at hand is *United States v. Roberts*, 612 F.3d 306 (5th Cir. 2010). There, law enforcement received a tip that a man, who they later determined to be Brian Michael David Roberts, was in possession of stolen items and guns. *Id.* at 308. After identifying Roberts, officers determined that he had several outstanding arrest warrants for traffic offenses, and three officers proceeded to Roberts' apartment. *Id.* Roberts answered the door and the officers advised that they were there to execute the arrest warrants. *Id.* After Roberts identified himself, officers requested that he produce identification as verification, prompting Roberts to move back into the apartment, where other individuals were also present. *Id.* As Roberts turned to retrieve his wallet from an entertainment center, the officers observed a pistol magazine and loose rounds of ammunition on the entertainment center within easy reach of other occupants of the apartment. *Id.* at 309. The officers secured the occupants of the apartment and retrieved the magazine. *Id.* The officers additionally seized a gun that Roberts informed them was under the couch, and, while performing a protective sweep, a shotgun that was in another room. *Id.* While lawfully inside the apartment, "the officers discovered that Roberts was an unlawful user of a controlled substance and that [a second defendant] had a prior felony conviction . . . ." *Id.* at 314.

Although Roberts filed a motion to suppress in the district court, the motion was not based on an argument that the firearm's illegal nature was not immediately apparent, as is required by the plain view doctrine. *Id.* at 313. He did, however, raise this argument on appeal, limiting the Court's review of this issue to whether there was plain error. *Id.* On this review, the Fifth Circuit held that "the police were justified in temporarily seizing the weapons under the circumstances."

23

*Id.* The Court explained that the individuals in the apartment who were not handcuffed could have accessed the unsecured weapons, making it reasonable for the officers to "seiz[e] the weapons for the safety of themselves and the apartment's occupants." *Id.* at 314. The Court further concluded that "[t]he officers were entitled to maintain control over the weapons while they completed their investigation of the individuals inside the apartment." *Id.* Additionally, because the officers learned that it was illegal for Roberts to possess the weapon while completing their investigation, "the illegality of the firearms became apparent such that permanent seizure was warranted." *Id.*

Also analogous is *United States v. Malachesen*, 597 F.2d 1232, 1233 (8th Cir. 1979), in which, while executing a search warrant for a snowmobile and marijuana, the police located a cocked and loaded revolver under a mattress, which they secured and unloaded. After discovering the firearm, but before completing the search, officers learned that a resident of the house had a prior felony conviction, leading to his indictment for unlawful possession of a firearm. *Id.* at 1234. The Eighth Circuit held that no Fourth Amendment violation occurred because the firearm was accidentally discovered during an authorized search, was permissibly secured for safety reasons, and, although the illegality of the firearm was not immediately apparent when it was discovered, its illegality became apparent while it was validly temporarily seized. *Id.* at 1234-35.

In *Malachesen*, the Eighth Circuit distinguished its prior decision in *United States v. Clark*, 531 F.2d 928 (8th Cir. 1976). There, officers executed a search warrant for controlled substances, as well as an arrest warrant for the defendant for unauthorized distribution of controlled substances. *Id.* at 930. During the search, the defendant was handcuffed and officers asked him whether he had any firearms. *Id.* The defendant responded that he did, advising officers of the firearms' locations and that the firearms were loaded. *Id.* After locating the weapons, an officer recorded the serial number of a pistol. *Id.* The serial numbers of other items in the residence, such as a

stereo system, were also recorded by officers. *Id.* A month later, a special agent investigated the firearm based on its serial number, which resulted in seizure of the weapon and the defendant's indictment on illegal interstate transportation of a firearm. *Id.* at 930-31. The defendant moved to suppress the firearm, arguing that the officers exceeded the scope of the search warrant by inventorying his possessions and that officers lacked sufficient cause to be concerned about their safety. *Id.* at 931.

The Eighth Circuit in *Clark* held that the officers exceeded the scope of the search warrant for controlled substances by "inventory[ing] a significant quantity of [the defendant's] personal and business property," and methodically recording serial numbers from a variety of property, including motorcycles, tools, shop equipment, stereo equipment, and personal effects." *Id.* Additionally, the officers could not satisfy the requirement under the plain view doctrine that the incriminating nature of the pistol was immediately apparent. *Id.* at 932. As a result, the Court concluded that "[u]nder these circumstances, we regard the actions of the police officers, which resulted in a wholesale examination of appellee's property unrelated to the authorized search for controlled substances, as inconsistent with the thrust of the plain view doctrine." *Id.*

Here, the facts more closely resemble those of *Roberts* and *Malachesen*. The officers had reason to be concerned for their safety because Kendricks was unsecured within the garage with them. Cappiello was permitted to seize the weapon, make it safe, and maintain control of the weapon until the search was complete and no further safety threat existed. While lawfully in possession of the firearm, the illegal nature of the firearm became apparent.

Accordingly, it is hereby

**ORDERED**:

1.    The Motion to Suppress Fruits of Illegal Search of Home (Doc. 16) is **DENIED**.

2.    The Motion to Supplement Record or in the Alternative Grant the Motion to Suppress Due to a Giglio Violation (Doc 55) is **DENIED**.

   **DONE AND ORDERED** in Tampa, Florida on September 5, 2017.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any